UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                      CASE NO.: 2:18-cr-68-FtM-38MRM

JUAN CARLOS ALFARO GARCIA

_____/

## REPORT AND RECOMMENDATION

Pending before the Court are:  Defendant's Motion for Hearing to Determine

Competency and Memorandum of Law, filed on February 7, 2019 (Doc. 63); the Government's

Response to Defendant's Motion for Hearing to Determine Competency, filed on February 21,

2019 (Doc. 68); a Forensic Evaluation from Defendant's expert, Dr. Paul S. Kling, dated

February 5, 2019 (Doc. 66); and a Forensic Report from the court-appointed evaluator, Dr.

Rodolfo A. Buigas, dated May 21, 2019 (Doc. 92).  For the reasons below, the Undersigned

respectfully recommends that Defendant be found competent to proceed to trial.

## RELEVANT PROCEDURAL BACKGROUND

On January 28, 2019, Dr. Paul S. Kling, a psychologist, evaluated Defendant Juan Carlos

Alfaro Garcia.  (Doc. 66 at 1).  Based upon that evaluation, Dr. Kling opined in a written

forensic evaluation report dated February 5, 2019 that Defendant lacks competency to proceed in

this case.  (*Id.* at 4).  Defendant filed the instant Motion for Hearing to Determine Competency

on February 7, 2019.  (Doc. 63).  In response, the Government took the position that "[d]ue to

the competency concerns raised by defense counsel, the Court should commit the [D]efendant to

the custody of the Attorney General which would enable the [D]efendant to be observed over the

course of a thirty day evaluation period" as provided by 18 U.S.C. § 4247.  (Doc. 68 at 3).

On February 22, 2019, the presiding United States District Judge granted the Government's request for Defendant to be evaluated under 18 U.S.C. § 4241(b) and the provisions of § 4247(b) and (c).  (Doc. 69 at 2).  The District Judge reserved ruling on Defendant's Motion for Hearing to Determine Competency (Doc. 63) until after the court-ordered evaluation could be completed.  (*See* Doc. 69 at 3).  At the request of the Warden of the facility where Defendant was committed for the evaluation, the Court extended the evaluation period to April 10, 2019.  (*See* Docs. 77-78).

On May 7, 2019, the presiding District Judge entered an Order directing the Government to provide a status update regarding the competency evaluation and report because no report had been filed.  (Doc. 84 at 1).  On May 9, 2019, the Government filed a Notice of Status of Defendant's Competency Evaluation Report, in which the Government requested a further extension for the evaluator to complete his report and file it with the Court.  (Doc. 87 at 3).  On May 10, 2019, the Court ordered the report to be filed under seal on or before May 24, 2019. (Doc. 88).

The report, dated May 21, 2019, was ultimately filed on May 22, 2019.  (Doc. 92).  In the report, Dr. Rodolfo A. Buigas, a forensic psychologist, states that Defendant was evaluated as requested by this Court's Order from March to April 2019.  (*Id.* at 1).  Dr. Buigas opined that Defendant "appears to have sufficient understanding of the legal process and a capacity to assist in his own defense if motivated to do so.  Hence, the [D]efendant's degree of trial competency is satisfactory, and it is recommended that [Defendant] be found Competent to Stand Trial."  (*Id.* at 9).  The same day Dr. Buigas' report was filed with the Court, the presiding District Judge referred Defendant's Motion for Hearing to Determine Competency (Doc. 63) to the

Undersigned for a competency hearing and for issuance of a report and recommendation.[1]  The Undersigned immediately noticed the case for a status hearing on June 4, 2019.  (Doc. 93).

The status hearing before the Undersigned took place, as noticed, on June 4.  (Doc. 94).  At the hearing, Defendant's counsel orally requested that the Government produce certain documents from the Bureau of Prisons.  (*Id.*).  In response, the Government orally requested time to confer with the Bureau of Prisons regarding the requested production and to produce any documents.  (*Id.*; *see also* Doc. 95).  The Undersigned orally granted the Government's request and noticed the competency hearing to occur on June 26, 2019 to allow sufficient time for the document production issues to be resolved.  (*See* Doc. 96).  On June 12, 2019, the Government filed a Motion for Order to Produce, asking the Undersigned to enter an order directing that the Bureau of Prisons – Federal Detention Center, Miami produce certain documents, reports, and records referenced in Dr. Buigas' report dated May 21, 2019.  (Doc. 101 at 1).  The next day, the Undersigned granted the Government's motion and ordered the specified documents to be produced.  (Doc. 102).  On June 24, 2019, Defendant's counsel filed a document entitled a Discovery Receipt in which he acknowledged receipt of the documents the Undersigned ordered to be produced.  (Doc. 106).

A competency hearing was held on June 26, 2019.  (Doc. 109).  Defendant was present at the hearing.  (*Id.*).  Defendant does not speak English; thus, a court-certified interpreter was provided.  (*Id.*).  Dr. Kling and Dr. Buigas testified at the hearing.  (*Id.*).  Additionally, counsel

---

[1]  The Motion was pending for nearly four months before it was referred to the Undersigned for further proceedings and the issuance of a Report and Recommendation.

presented oral argument following the conclusion of witness testimony. (*Id.*).[2] This matter is ripe for consideration.

Based on the testimony of the experts at the hearing and the information contained in the experts' reports, the Undersigned finds and recommends that Defendant is competent and that the case should proceed to trial.

## LEGAL STANDARD

The federal competency standard is set forth in 18 U.S.C. § 4241, which provides:

> If after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d). The standard to determine mental competency to stand trial "is whether the defendant ha[s] 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he ha[s] 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003) (citing *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986), which in turn quotes *Dusky v. United States*, 362 U.S. 402 (1960)). To be mentally incompetent to stand trial, therefore, Defendant must suffer from a mental disease or defect such that he is unable (1) to understand the nature and consequences of the proceedings against him or (2) to assist properly in his defense. 18 U.S.C. § 4241(d).

In determining whether Defendant has a mental disease or defect such that he is unable to assist properly in his defense, the competency statute is silent as to which party bears the burden

---

[2] The final transcript of the hearing was filed with the Court on July 23, 2019. (Doc. 117).

4

of proof.  *See* 18 U.S.C. § 4241(d).  The Eleventh Circuit, however, has stated that "'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.'"  *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)).  Additionally, the Supreme Court has stated, albeit in dicta, that the burden of establishing incompetence rests with the defendant.  *United States v. Izquierdo*, 448 F.3d 1269, 1277-78 (11th Cir. 2006) (citing *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) for the proposition that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence").  Moreover, decisions by this Court have also concluded that the moving party bears the burden of proving a defendant's incompetency.  *See, e.g.*, *United States v. Raiola*, No. 2:15-cr-106-FtM-38MRM, 2017 WL 218830, at *2 (M.D. Fla. Jan. 19, 2017) (Chappell, J.); *United States v. FNU LNU*, No. 6:15-cr-3-Orl-22TBS, 6:10-cr-238-Orl-22TBS, 2016 WL 158769, at *3 (M.D. Fla. Jan. 14, 2016) (Conway, J.).  Thus, the burden of proving incompetence rests with Defendant as the moving party such that Defendant must prove his incompetency by a preponderance of the evidence.  *See* 18 U.S.C. § 4241(d).

## EXPERT REPORTS AND TESTIMONY

### A.  DR. PAUL S. KLING

#### 1.  Forensic Evaluation Report Dated February 5, 2019 (Doc. 66)

According to his written report, Dr. Kling evaluated Plaintiff in a single meeting on January 28, 2019 at the Charlotte County jail in Punta Gorda, Florida.  (Doc. 66 at 1).  Dr. Kling's evaluation was done by means of a clinical interview and administration of the Wechsler Abbreviated Scale of Intelligence.  (*Id.*).  Dr. Kling also reviewed "a legal document provided by

[Defendant's] attorney." (*Id.*).[3] Dr. Kling used the services of an interpreter during the evaluation because Defendant does not speak English. (*Id.*). Defendant's attorney was present in the room, but "did not speak or participate in the process unless directly questioned by the interviewer." (*Id.*). Dr. Kling explained to Defendant the limits of confidentiality in the evaluation and Defendant signed "appropriate consent and release forms." (*Id.*).

According to Dr. Kling's report, "[w]hen asked what he had been charged with, [Defendant] said that he had been charged with entering the country illegally. When asked what his sentence or penalty might be if found guilty, he said that he did not know." (*Id.* at 2). Defendant was able to identify his attorney as "Brian." (*Id.*). When questioned about his attorney's job in the case, Defendant stated that his attorney "is working on this case." (*Id.*). When asked to explain the role of his attorney further, Defendant stated "to work on my case." (*Id.*). When asked about other things his attorney might do, Defendant responded "to try to fix my case." (*Id.*). When asked what a federal prosecutor does, Defendant responded that he did not know. (*Id.*).

Also according to the report, "[w]hen asked what a judge does in court, [Defendant] said 'to do his job as a judge'" but was unable to provide any additional information. (*Id.*). When asked "whose side the judge is supposed to be on in court, [Defendant] said that the judge is on the side of the federal attorney." (*Id.*). Defendant stated that he did not know what a jury is or what a plea bargain is. (*Id.*). Dr. Kling asked Defendant's attorney if he had discussed a plea bargain with Defendant. (*Id.*). According to Dr. Kling's report, Defendant's attorney "replied that he had spent at least two hour explaining the nature of a plea bargain to [Defendant] and

---

[3] Later in the report, Dr. Kling explains that he "reviewed the stipulated request for order of removal and waiver of hearing." (Doc. 66 at 3).

that, in fact, they had submitted a plea bargain with the prosecutor although it was later withdrawn." (*Id.*).  As stated in the report, Defendant's attorney also "said that, at this point, any other client he has worked with would have a very good understanding of the nature of a plea bargain." (*Id.*).

Moreover, Dr. Kling's report states that "[w]hen asked what his defense might be in court, [Defendant] replied 'about my family.'" (*Id.*).  When asked to explain further, Defendant "replied 'because of my children and wife.'  He said that this had a very strong effect on him." (*Id.*).  Defendant stated that he did not know what the word "evidence" means in court or what "a bailiff" does in court.  (*Id.*).

According to the report, Defendant told Dr. Kling that he was born in Mexico and "had come to the United States in either 1993 or 1998, but could not remember which." (*Id.*).  Defendant denied ever being abused during his childhood.  (*Id.*).  Although he initially denied suffering any serious medical illnesses or injuries, he later "said that he suffers from asthma and eye problems." (*Id.*).  Regarding his education, Defendant "said that he thinks he completed the first grade but was not sure.  He added that he is unable to read or write." (*Id.*).  Regarding work history, Defendant "said that he has worked as a roofer and has done well at that job" and "denied ever having been on disability." (*Id.*).  Defendant also denied any history of mental health problems, diagnoses, or treatment.  (*Id.*).  Defendant further denied every abusing alcohol or drugs.  (*Id.* at 3).  The report states that "[w]hen asked if he ever saw things or heard things that were not there, [Defendant] replied 'I miss my family.'  He then reiterated that he is very concerned about being away from his family, children, and wife." (*Id.*).

Dr. Kling's report describes Defendant during the evaluation as follows:

> [Defendant] was cooperative.   His ability to interact with the interviewer was limited.  His affect was flat.  [Defendant] became

> tearful when mentioning his family and needed several minutes to compose himself.   There were no indication of paranoid or delusional though content.   No other unusual behaviors were observed.  His appearance was unremarkable.

(*Id.*).

Concerning the consent and release forms Dr. Kling requested from Defendant, the report states:

> At the beginning of the interview, I requested [Defendant] to read and sign consent and release forms.  One form was read to him by the interpreter and then [Defendant] simply turned to his attorney and asked if he should sign it.  With my consent to respond, his attorney replied that he would suggest signing the document.  The second document was signed without being read to [Defendant] and was based simply on his acceptance of his attorney's opinion that it would be important to sign it.

(*Id.*).

With regard to testing, Dr. Kling explains in his report:

> I attempted to assess Mr. Garcia's intelligence by administering the Wechsler Abbreviated Scale of Intelligence.  Mr. Garcia was unable to answer more than three or four of the questions on the test and the testing was then discontinued.  If it were to be formally scored, it would probably generate a verbal IQ somewhere between 40 and 50.

(*Id.*).  The report states that Dr. Kling's diagnostic impressions are:

> AXIS I:  Deferred
>
> ASIS [sic] II:  Probable intellectual disability
>
> AXIS III:  Unknown

(*Id.*).

Dr. Kling opines in his report that Defendant "has a limited understanding of the charges against him.  He was able to explain that he had been charged with illegal entry into the country, but was unable to provide any additional information or details."  (*Id.* at 3-4).  Dr. Kling further

opines that Defendant "does not have the ability to appreciate the range and nature of possible penalties which may be imposed. He appeared to have no idea whatsoever what his sentence or penalty might be if found guilty." (*Id.* at 4). Dr. Kling also opines that Defendant "does not have the ability to understand the adversarial nature of the legal process." (*Id.*). Dr. Kling states that Defendant "did not understand the role of a judge, a jury, a prosecutor, or the nature of a plea bargain." (*Id.*). Dr. Kling also states that Defendant "had a very limited understanding of the role of his attorney. He initially stated that the job is [sic] attorney was to work on his case, but later added that the job of his attorney is to fix his case. However, he was unable to describe what that meant exactly." (*Id.*).

Furthermore, Dr. Kling opines in his report that Defendant "does not have the ability to provide pertinent information regarding his case to his attorney." (*Id.*). Dr. Kling explains that Defendant "was unable to do so during this evaluation and the partial intelligence testing and interview indicated a very limited capacity for verbal or abstract thinking." (*Id.*). Dr. Kling also opines that Defendant "does not have the ability to testify relevantly on his own behalf or challenge prosecution witnesses for the reasons described above." (*Id.*). Dr. Kling also opines that Defendant "has the ability to manifest superficially appropriate behavior in court. However, he will be unable to follow the proceedings of the court or participate in his own defense." (*Id.*).

On the ultimate question of competency, Dr. Kling's report states his opinion as follows:

> It is my opinion that [Defendant] is not competent to proceed. It is my opinion that he does not possess sufficient present mental ability to understand his case from a factual and rational perspective or to consult with his attorney with a reasonable degree of understanding. It is my opinion that [Defendant] is incompetent due to an intellectual disability and lack of even a basic education.

(*Id.*).

Regarding treatment, Dr. Kling's report states:

> No treatment recommendations are made at this time. Intellectual disability is considered to be a permanent condition and not amenable to psychological or psychiatric treatment. It is my opinion, with a reasonable degree of psychological probability, that the least restrictive appropriate placement for [Defendant] would be with his family, who can provide him with the support that he needs.

(*Id.* at 5).

### 2.    **Testimony**

Dr. Kling testified at the June 26, 2019 competency hearing. (Doc. 117 at 9-43).

### a.    *Direct Examination*

The defense proffered Dr. Kling as an expert in the field of psychology without objection from the Government, and the Undersigned accepted Dr. Kling as an expert in the field of psychology. (*Id.* at 10-11).

Dr. Kling testified on direct examination consistent with the matters and findings set forth in his written report. (*Id.* at 9-27). Dr. Kling further explained that he could not have examined Defendant without the assistance of an interpreter. (*Id.* at 11). He also opined that Defendant "didn't really appear to understand" the content of the consent and release forms Dr. Kling asked Defendant to sign before the evaluation. (*Id.*). However, Dr. Kling testified that Defendant understood that Dr. Kling would examine Defendant to determine whether Defendant is mentally fit to stand trial in this matter. (*Id.*).

Dr. Kling also testified that he attempted to administer the Wechsler Abbreviated Scale of Intelligence II to Defendant – an IQ test – but that Dr. Kling was unable to administer the test fully beyond the first part, which was a vocabulary test, because "it became apparent that [Defendant] was not able to complete the test." (*Id.* at 14). Dr. Kling explained that the portion of the test he attempted to administer is designed to measure verbal intelligence. (*Id.* at 15). He also explained that "[v]ocabulary, of course, correlates most highly with full-scale IQ. That is

the single test if you had to pick one test to approximate someone's IQ the vocabulary test would be the most useful." (*Id.*). Based on Defendant's performance on this test, Dr. Kling estimated Defendant's IQ to be somewhere around 40 or 50. (*Id.*). Dr. Kling explained that "[s]omeone with an IQ of 40 or 50 or somewhere in that range would probably be at the bottom one-tenth or two-tenths of one percent of the general population." (*Id.* at 16). According to Dr. Kling, Defendant's performance on the test "would place him in the bottom . . . two-tenths of one percent of the general population of the United States." (*Id.*).

Dr. Kling also testified that Defendant's answers to questions were brief and most of them were "I don't know." (*Id.*). Dr. Kling also characterized Defendant's demeanor as "flat" and his range of emotions "was very limited." (*Id.* at 16-17). Defendant was cooperative and he attempted to respond to questions, but "[h]is ability to interact with [Dr. Kling] was very limited. That is, he just answered questions and didn't show any additional ability to relate to [Dr. Kling]." (*Id.* at 17). Dr. Kling testified that Defendant "did not exhibit a normal range of emotions that we might expect from the average person." (*Id.*).

Regarding a probable diagnosis, Dr. Kling explained that he "did not determine a psychological or psychiatric diagnosis as in terms of mental illness." (*Id.*). Instead, Dr. Kling "indicated [Defendant] probably suffered from an intellectual disability based on his performance at the evaluation." (*Id.*). When asked what practical effect a probable IQ disability would have on a person's ability in verbal comprehension, Dr. Kling testified that "[i]t would make him – make it more difficult. He would have a hard time understanding things. He would most likely – and, again, based on the limited amount of testing that was done, he probably had difficulty with abstract reasoning, ability to – well, ability to understand what was happening." (*Id.* at 17-18).

When asked whether Defendant fully comprehends the charges that are pending against him, Dr. Kling testified "[o]nly in a very limited sense. . . . [H]e's been told that [sic] entering the country illegally. So he understands that at least at a superficial level. However, he did not know what his sentence or penalty might be if he were found guilty. So I would say that he has a limited understanding of the charges against him." (*Id.* at 18).

When asked for his opinion as to whether Defendant understands the adversarial nature of the criminal proceedings pending against him, Dr. Kling testified, "I would say not or, again, very limited." (*Id.* at 18-19). Dr. Kling explained, "[f]or example, when he's asked what a judge does in court, he said he does his job as a judge. And he – when I asked him to elaborate or explain further, he was not able to do so. When I asked whose side the judge is supposed to be on in court, he said that the judge is on the side of the federal attorney which is incorrect. When asked what a plea bargain is, he said that he did not know." (*Id.* at 19). Dr. Kling added that Defendant said he did not know what a plea bargain is even though counsel discussed that subject with Defendant for two hours and actually went through the procedures of entering a plea bargain. (*Id.*). Dr. Kling testified that these things indicated that Defendant "certainly does not understand some of the critical items necessary to be considered competent." (*Id.*).

As to whether Defendant is capable of providing relevant and pertinent information to his attorney to assist in his own defense, Dr. Kling testified that Defendant's ability is "very limited." Dr. Kling stated that Defendant could "probably answer fairly concrete question" but that Defendant is "not necessarily a reliable historian." (*Id.* at 20). Dr. Kling testified that it "would be unlikely" that Defendant would be capable of providing relevant and responsive testimony on his own behalf. (*Id.*). As to whether Defendant understand the defenses that may be available to him, Dr. Kling testified "I don't think he does have much understating of his legal

options.  [Defendant] I believe did not complete first grade, cannot read or write English or Spanish, and his ability to understand such things would be limited." (*Id.*).  Although Dr. Kling testified that Defendant is willing to cooperate with his lawyer, Dr. Kling opined that it "would seem very unlikely" that Defendant is capable of assisting in matters such as planning legal strategy in his own defense.  (*Id.* at 20-21).

When asked whether Defendant is capable of following simple instructions and advise, Dr. Kling opined that Defendant is capable and "his thinking I believe is fairly concrete so that if things were explained to him carefully and maybe repeatedly I think he would be able to understand them." (*Id.* at 25).  When asked whether Defendant is able to make informed decisions about his case after having the matter explained in layman's terms by his lawyer, Dr. Kling opined that Defendant is not able to do so.  (*Id.*).  When asked whether Defendant is able to make an informed choice between two well-explained alternatives such as entering a plea deal or proceeding to trial, Dr. Kling responded "I would be doubtful.  I would say that, again, depending on how carefully everything was explained to him and how clear and how many times it was explained to him he might be able to make such a decision.  But, again, I believe he has a limited capacity to make that kind of decision." (*Id.* at 25-26).

When asked whether Defendant would be able to follow and understand discussions or testimony of other witnesses such that he could point out errors, falsehoods or inconsistencies in a courtroom setting, Dr. Kling responded "again, in a limited way.  I don't think he would really be able to follow too carefully or advise his attorney, for example, of something that he thought was incorrect." (*Id.* at 26).  When asked whether Defendant is capable to testify competently on his own behalf in this matter, Dr. Kling stated "I believe he can answer questions. (*Id.*).  I believe he will answer them – you know, attempt to answer them.  I think he doesn't know a lot

about what's happening so that his ability to provide reliable information to the Court or to his attorney is, again, limited." (*Id.*).

Dr. Kling ultimately opined that he does not believe Defendant has either a factual or rational understanding of his legal situation. (*Id.* at 27).

> b.    *Cross Examination*

On cross examination, Dr. Kling testified that his opinion is based on one hour spent with Defendant. (*Id.* at 27-28). He also testified that he believed Defendant was able to understand the interpreter who was present during his evaluation of Defendant. (*Id.* at 31). Dr. Kling conceded that Defendant was able to answer the basic question of what he was charged with and that Defendant's response was correct. (*Id.* at 32). Dr. Kling also conceded that he did not review any discovery in the case. (*Id.*).

When asked whether Defendant would be able to understand better if things were explained to Defendant, Dr. Kling responded "I said in a limited way, possibly, yes." (*Id.* at 33). Dr. Kling conceded that Defendant understood that his attorney was there to aid him. (*Id.*). Dr. Kling also conceded that when Defendant responded to a question by stating he did not know the answer, Dr. Kling "did not break [the question] down" to see if Defendant could then have the ability to answer. (*Id.* at 34). Dr. Kling testified that it is "possible" Defendant would have a better ability to understand things that are broken down for him. (*Id.*; *see also id.* at 42).

Moreover, Dr. Kling did not ask Defendant about Defendant's daily life other than asking about Defendant's prior employment as a roofer. (*Id.* at 35-36). Dr. Kling explained "in this case I didn't think that was particularly relevant given his other limitations. I'm not entirely sure that how a person functions in daily life is necessarily related to their competency to proceed in a legal setting." (*Id.* at 36). On further questioning, Dr. Kling explained that "in general a

person's ability to adapt or to function on a day-to-day basis may have some relevance in their ability to be competent in court but not necessarily because I have seen many people who function fine on a day-to-day basis and really don't understand the court system and have not been able to, you know, participate effectively in their own defense." (*Id.* at 36-37).

With respect to the test Dr. Kling administered, he explained that he was able to ask Defendant approximately 10 questions, which were vocabulary words in English that were translated to Spanish, before the test was halted. (*Id.* at 38-40). Dr. Kling acknowledged that other types of tests were available – including nonverbal tests – but that he did not use any of those tests. (*Id.* at 38-39).

Dr. Kling conceded that it is possible for someone who does not have a formal education to be competent. (*Id.* at 41).

With regard to the use of an interpreter, Dr. Kling testified that he has used an interpreter for an evaluation on a number of occasions and, in his opinion, doing so did not interfere with Dr. Kling's ability to assess competency. (*Id.* at 43).

## B.    DR. RODOLFO A. BUIGAS

### 1.    Evaluation Report Dated May 21, 2019 (Doc. 92)

According to Dr. Buigas' written report dated May 21, 2019, Defendant was designated to the Federal Detention Center (FDC-Miami) on March 11, 2019 for evaluation and Defendant arrived on the same date. (Doc. 92 at 1). Defendant was thereafter evaluated during the period March to April 2019. (*See id.*). "[D]efendant's evaluation entailed a comprehensive review of all available legal documentation pertaining to his case," which are itemized in Dr. Buigas' report. (*Id.* at 1-2). Additionally, "[m]embers of the Correctional Services staff were interviewed to report on the [D]efendant's adjustment to his unit and to incarceration in general."

(*Id.* at 2).  Dr. Buigas explains in his report that Defendant "underwent psychological testing and clinical interviews by Dr. Buigas."  (*Id.*).  Specifically, the report states that the following tests and procedures were used to assess Defendant's level of functioning:

> Clinical Interviews
>
> Mental Status Examination
>
> Validity Indicator Profile (VIP)-Nonverbal Subtest
>
> Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2)
>
> Comprehensive Test of Nonverbal Intelligence-Second Edition (CTONI-2)

(*Id.*).

According to the report, Defendant "proved to be an adequate historian.  He was able to provide detailed autobiographical information although he minimized information that would portray him in a negative manner such as past criminal behavior."  (*Id.*).  Defendant reported to Dr. Buigas that Defendant was born on March 17, 1981 in Mexico, that he initially immigrated to the United States in 1993, and that he has lived in Fort Myers, Florida since that time with the exception of when Defendant was deported back to Mexico.  (*Id.*).  Defendant also indicated to Dr. Buigas that Defendant is married, has one biological offspring and 8 step-children that Defendant has helped raise while living in Fort Myers.  (*Id.*).  Defendant reported to Dr. Buigas that Defendant "completed 'maybe' one year of education," and Defendant is illiterate in all languages.  (*Id.*).  Regarding employment, Defendant "reported working in Mexico from the age of 15 or 16 in the agricultural camps" and "he worked in roofing since immigrating to the United States."  (*Id.* at 3).

Dr. Buigas states in his report that Defendant reported a childhood history of asthma, that Defendant uses an inhaler, and that Defendant was hospitalized due to this condition approximately one year ago.  (*Id.*).  Defendant denied "any history of surgeries, other medical conditions, and head injuries."  (*Id.*).  Defendant also "denied any formal psychiatric history; however, he indicated that he has been 'nervous' much of his life."  (*Id.*).  Defendant also denied "any history of alcohol and illicit substance abuse."  (*Id.*).

Concerning Dr. Kling's prior evaluation, Dr. Buigas' report states:

> The [D]efendant underwent a forensic evaluation by Paul S. Kling, Ph.D., as reported on February 5, 2019.  Dr. Kling indicated that a Spanish interpreter was utilized for the interview and attempted Wechsler Abbreviated Scale of Intelligence.  Although the version of this test was not specified, it should be noted that a translation of this measure would have invalidated standardized administration (i.e., validation) and rendered the results invalid even if it would have been completed.  Dr. Kling do not [sic] give a definitive diagnoses, rather noted "Probable intellectual disability." Regardless, Dr. Kling indicated that this test was discontinued.  Dr. Kling opined that the [D]efendant was incompetent to stand trial utilizing the State of Florida Statues [sic].

(*Id.*).

Dr. Buigas' report contains evaluation findings in each of the following categories:  (1) behavioral observations; (2) current mental status; (3) psychological test results, including cognitive functioning and psychological/personality functioning; (4) medical evaluation, studies, and treatment; and (5) psychiatric treatment.  (*Id.* at 4-6).

With respect to behavioral observations, Dr. Buigas states in the report that Defendant "was semi-cooperative with the examination procedures."  (*Id.* at 4).  "While [Defendant] complied with interviews and psychological testing, he approached most of the tests with suboptimal effort."  (*Id.*).  The report also states that "[d]uring most of the evaluation period, correctional staff working on the unit where the [D]efendant was housed reported that he

exhibited no difficulties in communication, interactions, self-care, feeding, or other activities related to daily living." (*Id.*).

With respect to Defendant's current mental status, Dr. Buigas states in the report that Defendant "displayed adequate hygiene and dentition" and Defendant's "manner of dress was appropriate." (*Id.*). Defendant also "demonstrated an appropriate degree of eye contact throughout the examination" and his "[f]acial and other nonverbal expressions were congruent with verbalizations." (*Id.*). The report states that Defendant "displayed no significant difficulty with ambulation and did not demonstrate psychomotor agitation or retardation." (*Id.*). Defendant "remained oriented to current and legal circumstances throughout the evaluation period, although his stated age was in error by one year." (*Id.*). Dr. Buigas' report describes Defendant's attention span as average and states that Defendant "exhibited coherent, organized, logical and concrete thought processes." (*Id.*). "Content was reported as remarkable for anxiety, illiteracy and limited comprehension." (*Id.*). Defendant "did not appear to be attending or reacting to internal stimuli or other perceptional disturbances." (*Id.*). He denied any current suicidal or homicidal ideation and did not display symptoms of mania, delusions, or obsessions. (*Id.*).

Dr. Buigas states in his report that he found Defendant's speech pattern to be normal and "[e]xpressive language was organized, but limited to Spanish and characterized by frequent use of slang." (*Id.*). Additionally, Defendant's "receptive language skills were somewhat limited by comprehension for some tasks. [Defendant's] intelligence is estimated to fall at well below average levels based on his vocabulary and general fund of knowledge." (*Id.*). "[D]efendant demonstrated a full range and intensity of emotional expression," but "[h]is mood was reported as anxious." (*Id.*). The report goes on to state that Defendant's "insight into his legal status and

his judgment as to cause and effect relations were adequate" and "[o]verall, [Defendant's] mental status was consistent throughout the evaluation period." (*Id.*).

With respect to psychological test results relating to cognitive functioning, Defendant was administered the CTONI-2, which "yields an estimate of intelligence and is composed of six subtests that measure nonverbal intellectual performance." (*Id.* at 5). "The skills measured are: analogical reasoning, categorical classifications, and sequential reasoning." (*Id.*). "The scores on each subtest are converted into standard scores, which allow for a comparison in performance between the test taker and a normative group." (*Id.*). "The scores are then converted into Full Scale (Nonverbal), Pictorial and Geometric Nonverbal Scale Composites which are similar to Intelligence Quotient estimates." (*Id.*). According to Dr. Buigas, "[t]his measure is appropriate for persons whose primary language or culture is not English or whom traditional intelligence measures that rely on heavy language content or complicated motor responses may penalize and result in inaccurately suppressed scores." (*Id.*). Dr. Buigas further explains in the report that "[t]he administration [of the CTONI-2] can be done in pantomime with limited verbal instructions (English or Spanish) and requires minimal nonverbal responses." (*Id.*).

Dr. Buigas' report describes the results of the CTONI-2 in Defendant's case as follows:

> [Defendant's] overall intellectual functioning was estimated to fall in the Very Poor range. Assuming a motivated and candid performance, there is a 95 out of 100 chance that his true IQ score falls within this range. Low scores on this measure can result from: disinterest in test taking, visual impairment, visual inattention, visual agnosia (inability to recognize stimuli), a development disorder (e.g., Intellectual Disability) or otherwise delayed cognitive development.

> If taken at face value, his overall score would correspond to the Intellectual Disability (formerly Mental Retardation) range of intellectual functioning. Persons with an Intellectual Disability level of intellectual functioning require minimal support and

> supervision to assist with activities of daily functioning and
> especially with social and financial support.

(*Id.*).  Dr. Buigas goes on to state, however, that "there are several reasons to suggest that this not

the [D]efendant's true level of intellectual functioning."  (*Id.*).  "First, this diagnosis requires a

classification during the developmental period" but "[D]efendant has no corroborated history of

this classification."  (*Id.*).  "Second, there do not appear to be any limitations in [Defendant's]

adaptive functioning as indicated by correctional staff working on the unit where [Defendant]

was housed."  (*Id.*).  "Finally, objective measures suggest that [Defendant] was either

exaggerating cognitive symptoms or, at the very least, not putting forth motivated effort during

his psychological testing."  (*Id.*).

Also with respect to psychological test results relating to cognitive functioning,

Defendant completed the VIP, which according to Dr. Buigas' report "is a measure designed to

detect an examinee's response style on similar measures of cognitive abilities that are

administered concurrently."  (*Id.*).  Dr. Buigas explains that "[o]nly the Nonverbal subtest was

administered due to the [D]efendant's claim of no competency in the English language."  (*Id.*).

Dr. Buigas' written report describes the results of the VIP in Defendant's case as follows:

> [D]efendant's performance on the Nonverbal component was
> Irrelevant, which is suggestive of random responding and that the
> [D]efendant did not exert motivated sustained effort across all
> items.[4]
>
> This finding suggests that [Defendant] exhibited poor motivation to
> present his cognitive abilities accurately; therefore, the results not
> be viewed as valid indication of his current cognitive functioning.

---

[4]  As explained *infra* at Part B(2), Dr. Buigas testified at the hearing that this portion of his
written report was incorrect and that Defendant's performance on the Nonverbal component of
the VIP was actually classified as "Inconsistent," not "Irrelevant."  (Doc. 117 at 84-85).  For this
reason, the Undersigned relies on Dr. Buigas' testimony at the hearing regarding the results of
the VIP, and the Undersigned disregards the incorrect portion of Dr. Buigas' report on that point.

(*Id.* at 5-6).

With respect to psychological test results relating to psychological and personality functioning, Dr. Buigas' report states that the MMPI-2 was administered to Defendant.  (*Id.* at 6).  According to Dr. Buigas' report, "[t]his measure allows for the comparison of [Defendant's] scoring pattern to the scoring pattern of normal and psychiatric populations."  (*Id.*).  "The measure also detects deviations from candid responding."  (*Id.*).  The report describes the results of the MMPI-2 in Defendant's case as follows:

> [D]efendant's response style reflected a consistent and varying degree of exaggerated endorsement of psychiatric symptoms not seen in genuine psychiatric populations.  On the initial portion of the measure, the degree of exaggeration was insufficient to render the measure invalid for clinical interpretation; however, the latter portion was invalidated due to the level of exaggerated endorsement.  In addition, the [D]efendant endorsed an unrealistic level of moral virtue and freedom from common human faults.  Given the [D]efendant's response style in his psychological functioning on the objective measure, the following clinical impressions should be viewed with caution.
>
> [Defendant's] view of his environment is realistic, but unconventional, simplistic, and negativistic.  His self-concept if fragile.  Interpersonally, he tends to be aloof and have strained relationships.  He believes he is alienated.  Affectively, he is moody, unpredictable, unfriendly, and suspicious of the motives of others.  He perceives a borderline adjustment to his current situation.

(*Id.*).

With respect to medical evaluation, studies, and treatment, Dr. Buigas states in his report that Defendant "underwent routine physical examinations and laboratory testing" and "was diagnosed with Asthma," for which he was prescribed medication.  (*Id.*).  With respect to psychiatric treatment, the report states that Defendant was not evaluated by the staff psychiatrist or treated with psychiatric medications during the evaluation.  (*Id.*).

Dr. Buigas' report sets forth the following diagnostic impressions under the Diagnostic and Statistical Manual for Mental Disorders-Fifth Edition ("DSM-5"):  (1) Unspecified Anxiety Disorder, 300.00; (2) Borderline Intellectual Functioning, V62.89; and (3) Other Specified Personality Disorder (with Antisocial Features), 301.9.  (*Id.*).  In the Case Formulations section of his report, Dr. Buigas explains that Defendant "meets criteria for multiple classifications under the current system of diagnostic psychiatric disorders (DSM-5)."  (*Id.* at 7).

Regarding Unspecified Anxiety Disorder, the report states that "Defendant appears to meet the criteria for some form of anxiety disorder," but Defendant "was vague in reporting the nature of active symptomatology and he failed to demonstrative objective indications of a more specific condition."  (*Id.*).  Additionally, "[t]here is no corroborated history of the [D]efendant's mental illness."  (*Id.*)  "Therefore, the classification of Unspecified Anxiety Disorder was assigned to communicate a degree of diagnostic uncertainty."  (*Id.*).

Regarding Borderline Intellectual Functioning, the report states:

> According to the DSM-5, three features are necessary in order to diagnose Intellectual Disability (ID) (formerly known as Mental Retardation):  (1) deficits in intellectual functioning (i.e., problem solving, academic learning, etc.) as confirmed by standardized intelligence testing; (2) deficits in adaptive functioning that result in a lack of personal independent [sic] and social responsibility; and (3) onset of intellectual and adaptive deficits during the developmental period.  While [Defendant's] IQ score fell in the Mild range of ID, his adaptive functioning was not impaired based on staff observations during the course of the evaluation and self-report while in the community.  In regard to activities of daily living in the community, the [D]efendant stated that he was able to drive although he could never get his Driver's License due to a lack of a Social Security Number.  The [D]efendant indicated that he was able to utilize public transportation, assist with household chores, care for pets, socialize, cook simple meals, and work.  Furthermore, the [D]efendant has no history of developmental problems throughout his life.  Finally, the [D]efendant's current testing on cognitive measures is suggestive of sub-optimal effort. Overall, [Defendant's] assessment results, self-reported history, and observations suggest

> that his cognitive and behavioral functioning is more consistent with
> persons falling in the Borderline Intellectual Functioning range.

(*Id.*).

Regarding Other Specified Personality Disorder (with Antisocial Features), the report

states:

> [Defendant] exhibited many tendencies that appeared to be of a
> pervasive, characterological nature.  His idiosyncratic style of
> thinking, interpersonal difficulties, emotional expression,
> perceptions, and asocial behaviors suggest the presence of a
> personality disorder.  While not one specific personality disorder
> incorporates all of the symptoms of this individual, the current
> psychiatric nosological system allows for the labeling of a generic
> personality disorder with a series of descriptive specifiers.  In other
> words, for this individual, the diagnosis of Other Specified
> Personality Disorder with Antisocial Features may best describe his
> symptoms.  He does not appear to meet the criteria for a more
> specific personality disorder.

(*Id.*).

As to the potential for malingering, Dr. Buigas states in his report that:

> According to the DSM-5, the essential feature of Malingering is the
> intentional misrepresentation such as in the fabrication or gross
> exaggeration of physical or psychological symptoms, for gains such
> as receiving diminished legal ramifications.  Malingering should be
> considered when any of the following combinations occur:  lack of
> cooperation during the evaluation, there is evidence for the presence
> of Antisocial Personality Disorder, the presentation occurs in a
> medicolegal context, or there is marked discrepancy between
> subjective and objective findings.  A classification of Malingering
> was considered in this case given [Defendant's] approach on
> psychiatric and cognitive testing; however, it is possible that the
> [D]efendant's style of responding was partially a product of limited
> comprehension.  Therefore, while this classification was considered,
> it was not rendered.

(*Id.* at 7-8).

Dr. Buigas adds in his report that Defendant "may warrant additional diagnoses, such as a

learning disability, but his lack of effort on testing prohibited the possible classification of other

conditions." (*Id.* at 8). Dr. Buigas further states that "[i]f the [D]efendant proves more compliant in the future, he should undergo cognitive and psychological testing." (*Id.*).

With regard to treatment recommendations, Dr. Buigas states that Defendant "may benefit from individual psychotherapy to improve his coping mechanisms and style of interacting with others; however, many of his difficulties stem from personality traits which likely prove resistant to therapeutic interventions." (*Id.*). Dr. Buigas also states that Defendant "may also benefit from periodic treatment with psychiatric medications to address transient negative mood states (i.e., anxiety)." (*Id.*). Dr. Buigas concludes that Defendant's prognosis is "fair" and that Defendant's current mental status "appears relatively stable." (*Id.*).

On the ultimate question of competency, Dr. Buigas' report states his opinion as follows:

> [D]efendant appeared to have an adequate understanding of the legal process. He understood the adversarial nature of the proceedings as he was charged with illegal re-entry into the United States after deportation. The [D]efendant understood that he re-entered the country illegally, but explained that he is married and his wife along with 8 step-children that he raised live in Fort Myers, Florida. The [D]efendant stated that he needed to help support his family by staying in this country. [Defendant] indicated that he has been incarcerated for about one year and understood that further period of incarceration could result with a conviction. He also understood that he could be deported. The [D]efendant knew his attorney and expressed a willingness to assist in his own defense; however, he indicated that he often cannot comprehend some of the legal issues discussed.
>
> . . . . While the [D]efendant does not appear to be giving full effort during some portions of the current evaluation, he does not appear to currently suffer from an active phase of mental disease or defect that would interfere with his trial competency. He does appear to have limited cognitive abilities and would likely benefit from the use of more simplistic language and clarification of legal terminology. He may require some repetition and explanations especially given that he indicates he is illiterate and cannot reference written material. The Courts typically have not equated milder forms of cognitive impairment or even Intellectual Disability with a determination of trial incompetency. [Defendant] appears to have a

> sufficient understanding of the legal process and a capacity to assist in his own defense if motivated to do so.  Hence, the [D]efendant's degree of trial competency is satisfactory, and it is recommended that [Defendant] be found Competent to Stand Trial.

(*Id.*).

### 2.    Testimony

Dr. Buigas also testified at the June 26, 2019 competency hearing.  (Doc. 117 at 45-88).

#### a.    Direct Examination

The Government proffered Dr. Buigas as an expert in the field of forensic psychology without objection from Defendant, and the Undersigned accepted Dr. Buigas as an expert in the field of forensic psychology.  (*Id.* at 49).

Except as described below in connection with the VIP test results, Dr. Buigas testified on direct examination consistent with the matters and findings set forth in his written report.  (*Id.* at 45-88).  Dr. Buigas also testified that Defendant was in the facility where Dr. Buigas conducted his evaluation for at least 30 days, during which Dr. Buigas had contact with Defendant on more than one occasion.  (*Id.* at 50).  Dr. Buigas explained that in connection with his evaluation, he reviewed discovery and other documents relating to Defendant's case.  (*Id.* at 51).  Dr. Buigas testified that one benefit to having a defendant incarcerated is that he can ask unit staff in the same housing unit as the defendant whether the defendant has had any problems functioning in the unit.  (*Id.* at 52-53).  Dr. Buigas testified that he was not alerted by unit staff to any adjustment issues regarding Defendant.  (*Id.* at 53).  Dr. Buigas testified that he saw Defendant four times over thirty days as part of Defendant's evaluation.  (*Id.*).  Dr. Buigas explained that his evaluation was done over a period of days and that no one else was with Dr. Buigas when he met with Defendant.  (*Id.* at 53-54).

Further, Dr. Buigas explained that he was able to communicate with Defendant in Spanish because Dr. Buigas' first language is also Spanish.  (*Id.* at 54).  When asked whether Defendant understood Dr. Buigas' questions, Dr. Buigas answered:  "Yes.  There was [sic] some questions where he needed clarification, simplification and maybe repetition.  But, yes, he was able to understand what I was asking him."  (*Id.*).  Dr. Buigas testified that Defendant was able to provide information regarding Defendant's past, though Dr. Buigas noted that Defendant sometimes gave "minimal responses" without elaborating, causing Dr. Buigas to query Defendant further.  (*Id.* at 55).  Dr. Buigas also testified that he thought Defendant sometimes "would not disclose information that might potentially portray him in a negative manner."  (*Id.*).

As for Dr. Kling's report, Dr. Buigas testified that he reviewed it.  (*Id.* at 57).

Regarding the offense charged in this case, Dr. Buigas testified that Defendant was able to state his understanding of the charge against him – *i.e.*, illegal re-entry – and provide information about Defendant's prior deportation.  (*Id.* at 58).  Defendant was also able to give Dr. Buigas details of how Defendant was arrested.  (*Id.*).  Dr. Buigas testified that Defendant appeared during the evaluation to understand the nature of the charges against him and Defendant told Dr. Buigas the correct charges.  (*Id.* at 59).  During the thirty days Defendant was at the federal detention center, Defendant did not have difficulties with communications, interactions, being able to care for himself, or other activities of daily life.  (*Id.* at 59-60).

Additionally, Dr. Buigas inquired of Defendant about his functioning in the community.  (*Id.* at 60).  Dr. Buigas explained that he asked for that information because he was familiar with Dr. Kling's report and his "possible classification of intellectual disability."  (*Id.*).  Dr. Buigas testified that the category of Intellectual Disability under the Diagnostic and Statistical Manual for Mental Disorders ("DSM") requires three things:  (1) deficits in cognition, in intellectual

functioning; (2) deficits in adaptive functioning, which according to Dr. Buigas is "probably more important than anything else right now for the classification of [intellectual disability];" and (3) the onset of these deficits had to have occurred during a developmental period.  (*Id.* at 60-61).  Dr. Buigas also explained that prior iterations of the DSM relied on a person's IQ score to determine intellectual disability, but the current version does not.  (*Id.*).

Dr. Buigas evaluated Defendant's adaptive functioning by asking other staff how Defendant was functioning in his current daily life and asking Defendant about his functioning in the community.  (*Id.* at 61).  According to Dr. Buigas' testimony, Defendant "was functioning pretty well in the community according to Defendant.  He said he knows how to drive, but he couldn't get a driver's license because he didn't have a Social Security number."  (*Id.* at 61-62).  Defendant also knows how to use public transportation.  (*Id.* at 62).  Defendant assists with household chores such as mopping, laundry, and yard work.  (*Id.*).  He cares for the dogs, washing and feeding them.  (*Id.*).  Defendant socializes primarily with his family, his wife, kids, and grandchild.  (*Id.*).  He helps with cooking.  (*Id.*).  He is able to make simple meals, but nothing elaborate.  (*Id.*).  Dr. Buigas testified that "there was no significant impairment" to Defendant's adaptive functioning.  (*Id.*).  Although Defendant told Dr. Buigas that Defendant is illiterate in every language, Dr. Buigas testified that a lack of formal education does not, *per se*, make an individual have intellectual disability.  (*Id.*).

Dr. Buigas testified concerning the three tests he administered to Defendant.  (*Id.* at 63).  Dr. Buigas testified that he chose the tests based on the fact that Defendant does not understand English and Defendant "is of lower intelligence aptitude."  (*Id.* at 63).  Dr. Buigas explained that he administered the Comprehensive Test of Nonverbal Intelligence Second Edition ("CTONI"), which is a fairly lengthy intelligence test that is all nonverbal and can be administered

completely in pantomime, but the test manual also has standardized translations that can be given in Spanish.  (*Id.* at 63-64).  Dr. Buigas administered the test in pantomime.  (*Id.* at 64).

Dr. Buigas testified that he is familiar with the test that Dr. Kling administered to Defendant, but Dr. Buigas chose not to administer that test because it is standardized in English and predominantly verbal.  (*Id.* at 64).  According to Dr. Buigas, any deviation from the standardized procedure of any test invalidates the test and renders the results meaningless.  (*Id.*).  Dr. Buigas chose to administer the CTONI because it is standardized in Spanish and can be administered in pantomime – as Dr. Buigas administered it to Defendant in this case – meaning there are no verbal instructions at all.  (*Id.* at 65-66).  Defendant was able to complete the CTONI, achieving a full-scale nonverbal score of 49.  (*Id.* at 66).

Dr. Buigas also administered a test called the Validity Indicator Profile ("VIP") that looks at effort—*i.e.*, how Defendant approached all his cognitive testing.  (*Id.* at 67).  Dr. Buigas testified that the VIP test is validated on Mental Retardation/Intellectual Disability populations and has verbal and nonverbal components.  (*Id.*).  According to Dr. Buigas, the VIP is derived from a short form of the CTONI called the TONI.  (*Id.*).  Dr. Buigas testified that Defendant achieved a score of "inconsistent" on the VIP, which "means he did not give full effort."  (*Id.*).  For that reason, Dr. Buigas does not take the score of 49 on the VIP as a valid indicator of Defendant's current intellectual functioning.  (*Id.*).

Dr. Buigas also administered the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2").  According to Dr. Buigas, this test is "the most common psychological test in the world" and is translated in about eighty languages.  (*Id.* at 68).  This test was administered in audio format in Spanish because Defendant cannot read.  (*Id.*).  Dr. Buigas testified that Defendant "gave mixed results on this one, so actually similar to the VIP in that it was

inconsistent in his effort level." (*Id.*). "The first half, the first actually two-thirds he was – he was candid enough to use the test for clinical interpretation. The last approximate third of the test he tended to exaggerate symptoms, so that portion of the test can no longer be used." (*Id.*). Dr. Buigas explained that "Defendant scored sufficiently in a consistent manner to suggest that he understood the content of the test." (*Id.* at 70).

When asked his opinion as to whether Defendant is able to understand the nature and circumstances of the proceedings against him, Dr. Buigas answered: "Yes. In a simplified way he is. He knows his charges. He knew that he could – he didn't have a specific time frame for possible penalties, but he knew he could serve a further period of incarceration. He had told me he had already been incarcerated for a year. And, in addition, he told me that he faces the possibility of deportation if convicted. So he understood the general parameters. And he was able to provide me detailed information, so I would assume that he could do the same to his defense counsel." (*Id.* at 70-71). Dr. Buigas opined that Defendant would be able to assist properly in his defense. (*Id.* at 71). Dr. Buigas also testified that Defendant appeared to understand the role of his attorney. (*Id.*) Dr. Buigas also opined that Defendant would be able to understand concepts that are broken down for Defendant. (*Id.* at 72).

　　　　　　　　*b.*　　*Cross Examination*

On cross examination, Dr. Buigas testified that Defendant complied with Dr. Buigas' interview and testing, and Defendant did not ignore any questions or otherwise attempt to disrupt the process. (*Id.*). Dr. Buigas nevertheless observed that Defendant may have approached some of the testing with suboptimal effort. (*Id.* at 73). As for Dr. Buigas' reliance on staff members' observations, Dr. Buigas testified that he could not name any staff member who provided a

report to him.  (*Id.*).  Dr. Buigas also testified that he was not given any reporting in writing from staff.  (*Id.* at 75-76).

Additionally, Dr. Buigas testified that he asked Defendant at least two times questions concerning Defendant's understanding of the criminal proceedings against Defendant.  (*Id.* at 76).  Dr. Buigas further testified that Defendant's score on the CTONI was 49, which is "somewhere in the mild to moderate range of [mental retardation/intellectual disability], not including the other two criteria that are necessary for [mental retardation/intellectual disability]." (*Id.* at 77-78).  As to malingering, Dr. Buigas opined that he did not think Defendant was deliberately trying to exaggerate symptoms.  Instead, Dr. Buigas testified "I think what I was seeing more than anything else was a mixture of maybe not sustained effort – you know, sometimes he didn't give me just his full effort – and probably some limited comprehension as well."  (*Id.* at 78-79).  So, Dr. Buigas considered a classification of malingering, but ultimately did not assign it.  (*See id.* at 79).

With regard to Defendant's cognitive ability, Dr. Buigas testified that "it's a good probability" that someone of limited cognitive ability would not understand a legal document waiving rights in a judicial process if the document were read to Defendant verbatim.  (*Id.* at 80). Dr. Buigas testified that "it needs clarification."  (*Id.*).

In reviewing Defendant's medical records from the Bureau of prisons, Dr. Buigas testified that the records only went back to March of 2019 when Defendant came into the Bureau of Prisons' system and Dr. Buigas would only he reviewed other medical records, if any, going back one year.  (*See id.* at 81-82).

In explaining the charge to Dr. Buigas, Defendant did not cite a statute section.  (*Id.* at 82).  When asked what the legal elements of the charge pending in this case are, Dr. Buigas

answered "I understand it's illegal re-entry after having been deported from formal felony conviction" and this understand of the charge is derived from reading the Indictment in this case. (*Id.* at 83).  Dr. Buigas testified that what Defendant told Dr. Buigas concerning the charge is consistent with Dr. Buigas' reading of the Indictment.  (*Id.*).

### c.     The Undersigned's Questions

Following cross examination by Defendant's counsel, the Undersigned asked Dr. Buigas about an apparent inconsistency between his in-court testimony and his written evaluation report concerning Defendant's score on the VIP.  (*Id.* at 84-85).  Dr. Buigas stated that the score described in his written report was incorrect.  (*Id.*).  Specifically, Dr. Buigas testified that Defendant's score on the VIP fell within the category of "Inconsistent" (*id.* at 84); whereas Dr. Buigas' report incorrectly states that Defendant's score on the VIP was "Irrelevant" (*id.*; *see also* Doc. 92 at 5).  This correction is favorable to Defendant because, according to Dr. Buigas, a score of "Irrelevant" is a more severe form of departure from candor than "Inconsistent."  (*See* Doc. 117 at 84).

### d.     Re-direct Examination

On re-direct examination, Dr. Buigas testified that his finding that Defendant gave inconsistent effort would have affected the overall effectiveness of the test.  (*Id.* at 85).  Dr. Buigas explained that "there's different degrees of departure from candor, from full effort.  But any departure, whether it's inconsistent, irrelevant or even suppressed, plus the MMPI, any departure is going to weaken the results, the numbers themselves.  And these numbers . . . I didn't take them at face value all except for the initial portion of the MMPI.  The way he approached that test was valid."  (*Id.* at 85-86).  As to Defendant's results on the CTONI, moreover, Dr. Buigas testified that one possibility, among others, as to why Defendant scored the

way he did might be Defendant's disinterest in testing, although the CTONI has no objective

way of detecting which possibility resulted in Defendant's score.  (*Id.* at 86-87).  Regarding the

elements of the charged offense, Dr. Buigas testified that the elements as explained by the

prosecutor's questioning of him during the hearing were consistent with Defendant's statements

to Dr. Buigas about the charges.  (*Id.* at 88).

> e.  *Re-cross Examination*

On re-cross examination, Dr. Buigas agreed with Defendant's counsel that the

classification of "Inconsistent" on the VIP is "not as serious as" a classification of "Irrelevant."

(*Id.* at 90).  Dr. Buigas confirmed that when talking to Defendant about the charge in this case,

Dr. Buigas did not read the elements of the offense to Defendant.  (*Id.* at 91).  However, Dr.

Buigas testified that Defendant "indicated to me that he was previously deported.  He was not

allowed to come back.  He came back because of his family, and he would continue to do so.  So

he knew it was illegal for him to come back, but he was going to continue to do so."  (*Id.*).

## ARGUMENTS OF COUNSEL AT THE EVIDENTIARY HEARING

**A.  Defendant's Arguments**

Following the presentation of evidence, Defendant's counsel argued that, based on the

testimony of Dr. Kling, Defendant "does not have either a rational or a factual understanding of

the proceedings against him," nor is Defendant able "to properly assist his counsel in his

defense."  (*Id.* at 92).  Counsel argued that "Defendant has likely a very substantially low IQ

quotient, somewhere in the range of 40 to 60, as compared to ordinary individuals, ordinary

intelligence which would have an IQ score of 100."  (*Id.*).  Relying on Dr. Kling's testimony,

counsel argued that "there would be various problems that the Defendant will experience in these

proceedings such as failure to understand the adversarial nature of the judicial proceedings, his

failure to truly comprehend the role of a judge, [and] his failure to comprehend what a plea agreement is." (*Id.* at 92-93). Counsel emphasized that Defendant stated he did not know what a plea agreement was even after Defendant consulted with his attorneys regarding a plea agreement, signed a plea agreement, and submitted the agreement to the Court. (*Id.* at 93; *see also* Doc. 35 (plea agreement); Doc. 36 (motion to withdraw plea agreement); and Doc. 39 (order granting motion to withdraw plea agreement)).

Defendant's counsel also argued that although Dr. Buigas does not agree with Dr. Kling's opinions, even Dr. Buigas found that that Defendant indicated "a very low score in his comprehension ability, [and] that persons of such an IQ range would typically require repeated, simplified explanations in the best-case scenario in order to comprehend the judicial proceedings against him." (Doc. 117 at 93). Counsel also emphasized that Dr. Buigas did not find that Defendant was malingering—*i.e.*, "[h]e was not intentionally trying to obfuscate the truth in any fashion." (*Id.*). Counsel further emphasized that even Dr. Buigas' report "produced a conclusion of very low intelligence." (*Id.*). On that basis, Defendant's counsel argued that Defendant had met his burden to show by a preponderance of the evidence that the Defendant has not displayed a factual, rational understanding of these case proceedings and cannot adequately assist in his own defense." (*Id.* at 93-94).

With regard to the incompleteness of Dr. Kling's testing of Defendant, counsel pointed out that Dr. Kling explained he was required to discontinue the test when he received a lack of responsive answers from Defendant. (*Id.* at 101). Regarding the forms Defendant signed at the time of his evaluation, counsel argued that Defendant signed what his attorney advised him to sign, but there is no "real information as to what he comprehended or did not comprehend in that action." (*Id.* at 101-102). As to Dr. Buigas' review of discovery and medical records in the case,

counsel argued that Dr. Buigas conceded the discovery was of limited application and that the medical records were by no means comprehensive and could not give a clearer picture to Dr. Buigas than what Dr. Kling had.  (*Id.* at 102).  Regarding Defendant's employment, counsel emphasized that Defendant's income is derived from manual labor as a roofer—Defendant is not an accountant, a lawyer, or a data entry clerk.  (*Id.* at 102-103).  Counsel also emphasized that adaptive functioning is only one component to evaluate a Defendant's competency to stand trial.  (*Id.* at 103).  Counsel also argued that Dr. Buigas based his report on staff reports from unidentified staff members from within the Bureau of Prisons.  (*Id.* at 103).

**B.**   **Government's Arguments**

In her oral argument, counsel for the Government emphasized the different durations and nature of the testing and evaluations performed by both experts.  (*Id.* at 95).  The Government underscored the fact that Dr. Kling:  (1) was unable to complete the only test he attempted to administer; (2) administered a vocabulary test that required translation from English to Spanish; (3) did not inquire about Defendant's adaptive functioning in daily life; (4) observed Defendant consulting with his attorney as to whether or not to sign the forms for the evaluation, which indicates Defendant understands the role of his attorney; (5) only saw Defendant on one occasion for approximately one hour; and (6) did not look at any of the discovery in the case.  (*Id.* at 95-96).  The Government also argued that Defendant's response to Dr. Kling's question regarding the nature of the charge in this case evinced a correct understanding of the charge.  (*Id.* at 96).

In contrast, Dr. Buigas:  (1) was able to observe Defendant on at least four occasions; (2) met with Defendant while he was housed at the federal detention center for at least a 30-day period; (3) reviewed the discovery in this case; (4) reviewed other documents provided by the Bureau of Prisons and the United States Marshals; (5) considered Defendant's adaptive

functioning and talked to unit staff who reported Defendant had no difficulties adapting to the unit; (6) was able to communicate with Defendant directly in Spanish because Dr. Buigas speaks Spanish; (7) chose and administered tests based on Defendant's language ability and lack of formal education, which tests Defendant was able to complete; and (8) elicited information from Defendant demonstrating a sufficient understanding of the nature of the charges pending against Defendant. (*Id.* 96-97).

Additionally, the Government emphasized Dr. Buigas' testimony that Defendant's effort during the testing and evaluation was inconsistent, even if it did not rise to the level of malingering, and that Defendant was semi-cooperative, approaching most of the tests with suboptimal effort. (*Id.* at 97-98). The Government also emphasized that Defendant was able to communicate with Dr. Buigas regarding his history and functioning in society and daily living situations. (*Id.* at 98). For example, Defendant related to Dr. Buigas that Defendant was able to hold a job in roofing since the time Defendant entered the United States in or about 1993. (*Id.*). Defendant even related to Dr. Kling that he did his job very well. (*Id.*). Defendant has a wife and children whom he supports by bringing in income to the household. (*Id.*). Defendant is able to drive, though he also understands that he cannot get a driver's license because he does not have a Social Security card. (*Id.* at 98-99). Defendant described being able to take public transportation to get to where he needs to go. (*Id.* at 99). Defendant also told Dr. Buigas that he is able to help with daily chores and take care of children. (*Id.*). According to the Government, Defendant has these "adaptive functions regardless of what his tested IQ is." (*Id.*).

Further, the Government pointed out that both Dr. Buigas and Dr. Kling testified that a lack of formal education does not render a person incompetent. (*Id.*). The Government argued that the testimony of both experts supports that Defendant may be able to understand matters that

are "broken down" and explained to him.  (*Id.*).  The Government also pointed out that there is no testimony in this case that Defendant suffered "any kind of injury as a child or any kind of mental disease in that respect."  (*Id.*).

The Government acknowledged that Dr. Buigas testified that Defendant "fell within the mild range of intellectual disability" and that Dr. Kling testified as to Defendant's "probable intellectual disability."  (*Id.* at 100).  Notwithstanding that, the Government argued that the expert testimony supports that Defendant is capable of understanding concepts that are broken down or simplified when explained to him.  (*Id.* at 100-101).

The Government argued that Defendant had not met his burden to show by a preponderance of the evidence that he is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  (*Id.* at 101).

## DISCUSSION

### 1.    Weight of the Experts' Opinions

The preponderance of the evidence standard requires the Court to determine "that the existence of [the] fact is more probable than its nonexistence."  *In re Winship*, 397 U.S. 358, 371 (1970).  In evaluating the evidence, the Court is free to assign appropriate weight to the expert opinions it receives.  *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005).  When the Court receives expert opinions with differing conclusions, it does not err "simply by crediting one opinion over another where other record evidence exists to support the conclusion."  *Id.* (citing *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998)).

Here, the Undersigned affords greater weight to Dr. Buigas' report and opinion for at least seven reasons.

First, Dr. Kling was not able to complete the only test he attempted to administer to Defendant because Defendant did not answer more than three or four of the questions on the test. (Doc. 66 at 3). Dr. Kling testified that he actually asked Defendant approximately ten questions before the test was halted. (Doc. 117 at 38-40). From that limited and incomplete test, Dr. Kling estimated that "*if* [the test] were to be formally scored, it would *probably* generate a verbal IQ somewhere between 40 and 50." (Doc. 66 at 3 (emphasis added)). Dr. Kling did not adequately explain how he arrived at a "probable" estimate of Defendant's verbal IQ based on Defendant's answers to only three or four vocabulary questions on a single test before that test was discontinued. (*See* Doc. 117 at 15). Because the test was discontinued after Defendant answered only three or four questions (out of approximately ten questions asked) and Dr. Kling did not attempt to administer any other tests (*id.* at 38-39), the Undersigned cannot conclude that the lone test Dr. Kling attempted to administer has any value whatsoever in determining Defendant's competency to proceed.

Second, the Undersigned credits Dr. Buigas' observation that the Wechsler Abbreviated Scale of Intelligence II – which is an IQ test based on vocabulary – is invalidated when administered through the use of a language interpreter. (Doc. 92 at 3). As Dr. Buigas explained, the test Dr. Kling chose is standardized in English and predominantly verbal, and any deviation from the standardized procedure of any test invalidates the test and renders the results meaningless. (Doc. 117 at 64). The Undersigned finds Dr. Buigas' approach of administering non-verbal testing in pantomime (*id.* at 65-66) to a Defendant who cannot speak English is more logical and, thus, the results of and opinions derived from Dr. Buigas' testing should be afforded more weight.

37

Third and somewhat relatedly, the Undersigned is highly skeptical of Dr. Kling's decision to attempt to administer a single vocabulary test to a Defendant who does not speak English, who requires the assistance of a Spanish-language interpreter, who is illiterate in all languages, and who states that he has had no formal education.  The Undersigned finds Dr. Buigas' approach of administering non-verbal testing and more than one test (*see id.*) to a Defendant with these characteristics is again more logical and, thus, Dr. Buigas' opinions should be afforded more weight.

Fourth, unlike Dr. Buigas, Dr. Kling never administered any testing to attempt to determine whether Defendant put forth suboptimal effort.  (*Id.* at 38-39).  Dr. Buigas did so and Defendant's score on that testing indicated Defendant put forth "inconsistent" and suboptimal effort at that time.  (*Id.* at 67-68, 84-85).  Because Dr. Kling did not administer further testing to determine Defendant's level of effort, the Undersigned cannot conclude whether the results reported by Dr. Kling were the product of Defendant's full effort or something else.

Fifth, Dr. Kling evaluated Defendant over a shorter period of time and had fewer contacts with Defendant than Dr. Buigas.  Courts have given more weight to evaluations conducted over a much longer period of time.  *See, e.g.*, *United States v. Carter*, No. 1:12-cr-29, 2013 WL 6668715, at *13 (E.D. Tenn. Dec. 18, 2013) (according less weight to the evaluation conducted in the shortest amount of time).  Here, Dr. Buigas evaluated Defendant four times over thirty days (Doc. 117 at 50, 53-54), while Dr. Kling only evaluated Defendant once for approximately one hour, (*id.* at 27-28).  Thus, the Undersigned affords Dr. Buigas' opinion more weight based on the greater amount of time Dr. Buigas spent with Defendant.

Sixth, Dr. Kling's diagnosis of Defendant was not definitive in any respect.  Based on the Wechsler Abbreviated Scale of Intelligence II, he estimated Defendant would "*probably* generate

a verbal IQ somewhere between 40 and 50." (Doc. 66 at 4 (emphasis added)). From that and other observations during his evaluation of Defendant, Dr. Kling's report noted "diagnostic impressions" of "deferred" as to AXIS I, "*probable* intellectual disability" as to AXIS II, and "unknown" as to AXIS III. (*Id.* (emphasis added)). Notwithstanding the lack of any definitive diagnosis, Dr. Kling leaps the conclusion that Defendant is not competent and opines that "the least restrictive appropriate placement for [Defendant] would be with his family, who can provide him with the support he needs." (*Id.* at 6). Dr. Buigas, on the other hand, clearly states his diagnostic impressions based on more contacts with Defendant over a longer period of time and after more testing that appears to have been more appropriate to Defendant's individual characteristics. (Doc. 92 at 6).

Seventh, Dr. Kling does not appear to have given any consideration to Defendant's level of adaptive functioning other than minimal questioning about Defendant's prior work as a roofer. (Doc. 117 at 35-36). Dr. Kling testified that he did not think adaptive functioning was particularly relevant given Defendant's other limitations. (*Id.* at 36). He also expressed doubt as to how adaptive functioning in daily life is related to a person's competency to proceed in a legal setting. (*Id.* at 36-37). Dr. Buigas, however, considered adaptive functioning and thoroughly explained the significance of adaptive functioning to determining a classification of intellectual disability under the DSM-5. (Doc. 92 at 5, 7; Doc. 117 at 52-53, 61-62). Given Dr. Buigas' explanation, the Undersigned is skeptical of Dr. Kling's non-definitive diagnosis of "probable intellectual disability" (Doc. 66 at 4) without regard to any consideration of Defendant's adaptive functioning.

For these reasons, the Undersigned affords more weight to the opinion and report of Dr. Buigas.

2.     **Defendant's Ability to Understand the Nature and Consequences of
the Proceedings Against Him and to Assist Properly in His Defense.**

As explained above, the competency standard requires Defendant to demonstrate by a

preponderance of the evidence that he is presently suffering from a mental disease or defect

rendering him mentally incompetent to the extent that he is unable to (1) understand the nature

and consequences of the proceedings against him or (2) assist properly in his defense.  18 U.S.C.

§ 4241(d).

In this case, both experts appear to agree that Defendant may have an intellectual deficit,

a low IQ, and a lack of formal education, although they disagree as to the appropriate

classification of Defendant's deficit, as well as the implications thereof for Defendant's

competency to proceed to trial.  (*Compare* Doc. 66 at 4-5, *with* Doc. 92 at 5, 7).  Both experts

plainly agree that a lack of formal education does not necessarily render a person incompetent.

(*See* Doc. 117 at 41, 62-63).  As to Defendant's intellectual deficit and low IQ, moreover, courts

have held that intellectual deficits and low IQ do not preclude a finding of competence.  *See, e.g.*,

*Carter*, 2013 WL 6668715, at *13 (finding defendant competent even though defendant was

withdrawn, had a low IQ, and was a simple thinker with a poor verbal memory and could be

expected to have difficulty with complex hypothetical questions); *see also Medina v. Singletary*,

59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]either low intelligence, mental deficiency, nor bizarre,

volatile, and irrational behavior can be equated with mental incompetence to stand trial."

(citation omitted)); *Gutierrez v. United States*, No. 8:13-cv-2336-T-30EAJ, 2014 WL 6473743,

at *7 (M.D. Fla. Nov. 18, 2014) (finding that "a low IQ or mental deficiency does not necessarily

mean that [a 2255 Petitioner] was incompetent to stand trial" and citing to *Medina*, 59 F.3d at

1107, for that proposition).

The Undersigned finds that Defendant is capable of understanding the nature and consequences of the proceedings against him and of assisting properly in his defense based on observations and opinions expressed in Dr. Buigas' report, which the Undersigned gives greater weight for the reasons detailed *supra*.  Specifically, according to Dr. Buigas, Defendant understood the adversarial nature of these proceedings.  (Doc. 92 at 8).  Defendant also adequately understood the nature of the charge against him – i.e., illegal re-entry into the United States after deportation.  (*Id.*).  He also understood that a conviction might result in a further period of incarceration and deportation.  (*Id.*).  The Defendant knew his attorney and expressed willingness to assist in his own defense.  (*Id.*).  Moreover, Defendant is an adequate historian.  (*Id.* at 2).

Additionally, during most of Defendant's evaluation period with Dr. Buigas, correctional staff working in the unit where Defendant was housed reported that he exhibited no difficulties in communication, interactions, self-care, feeding, or other activities related to daily living.  (*Id.* at 4).  These reports of adaptive functioning are consistent with Defendant's self-reported history of working successfully as a roofer, supporting his family, helping to raise children, performing household chores, caring for pets, and cooking simple meals.  (*Id.* at 2-3, 7-8).  The reports of adaptive functioning are also consistent with Defendant's statements that he knows how to drive, understands why he is not able to obtain a driver's license, and is capable of using public transportation.  (*Id.* at 7).

Furthermore, with the exception of misstating his age by one year, Defendant remained oriented to current and legal circumstances throughout his evaluation period.  (*Id.* at 4).  Defendant exhibited coherent, organized, logical, and concrete though processes.  (*Id.*).

41

Defendant's insight into his legal status and his judgment as to cause and effect relations were adequate, and his mental status was consistent throughout the evaluation period.  (*Id.*).

Although the results of CTONI-2 test Dr. Buigas administered suggested Defendant's overall intellectual functioning was estimated to fall in the "Very Poor" range, Dr. Buigas expressed doubt that this result reflected Defendant's true level of intellectual functioning based on (1) the lack of corroborated history during Defendant's developmental period, (2) observations by correctional staff as to Defendant's level of adaptive functioning, and (3) other objective testing suggesting that Defendant did not put forth motivated effort during his testing. (*Id.* at 5).

Upon consideration of the entire record, including the weight of the evidence from the experts' reports, the testimony of the expert witnesses, and the arguments made by counsel, the Undersigned finds that the preponderance of the evidence demonstrates that Defendant is competent and that this case should proceed to trial.

However, a finding of competency does not preclude the Court from providing certain accommodations at trial.  The court in *Carter*, for example, recommended simplifying and slowing down the proceedings and repeating information as needed, allowing ample time for defendant to ask and respond to questions, and allowing breaks for counsel to discuss information and developments with the defendant.  2013 WL 6668715, at *13.  Here, even Dr. Buigas opined that Defendant would likely benefit from accommodations in the form of using more simplistic language, clarifying legal terminology, repetition, and explanation.  (Doc. 92 at 8).

The Undersigned finds, therefore, that Defendant may be aided by accommodations such as simplifying and slowing down the trial proceedings, repeating information as needed, allowing ample time for Defendant to ask and respond to questions, allowing frequent breaks for counsel to discuss information and developments with Defendant, and lengthening the proceedings where necessary.  The specific accommodations necessary for Defendant, if any, can be addressed with the District Judge at the final pretrial conference.  To be clear, the Undersigned finds that Defendant is competent to stand trial in this case even without accommodation.  Nonetheless, the Undersigned finds that providing accommodations at trial would aid Defendant in consulting with his lawyers and in assisting properly with his defense at trial.

## CONCLUSION

Accordingly, the Undersigned **RESPECTFULLY RECOMMENDS** the following:

1.     That the pending Motion for Hearing to Determine Competency (Doc. 63) be

   **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.     The Motion should be granted insofar as it formally requested and the Court held an evidentiary hearing to determine the Defendant's competency; and

   b.     The Motion should be denied insofar as it seeks any additional or other relief.

2.     That Defendant be found competent, that this action proceed to trial, and that the presiding trial judge consider accommodations during trial, including simplifying and slowing down the trial proceedings, repeating information as needed, allowing ample time for Defendant to ask and respond to questions, allowing

frequent breaks for counsel to discuss information and developments with

Defendant, and lengthening the proceedings where necessary.

Respectfully recommended in Ft. Myers, Florida on November 10, 2019.


_____
MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and

Recommendation's factual findings and legal conclusions.  A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual finding or

legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir.

R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties